**E-FILED**
Friday, 01 April, 2005  10:02:59 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DAVID STROHMAIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1106 |
| | ) | |
| RAY DENNISON CHEVROLET, Inc., | ) | Judge Gorman |
| | ) | |
| Defendant. | ) | JURY DEMANDED |

## SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AND
## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON THE ISSUE OF CREDITOR STATUS OF DEFENDANT

Under Rule 56(d), Plaintiff moves for partial summary judgment on the issue of creditor status of Defendant. In support of his motion, Plaintiff states as follows:

### A. Introduction

1. Count I of Plaintiff's Complaint alleges violations of the Equal Credit Opportunity Act, 15 U.S.C. §1691 et seq.

2. One of the issues under ECOA is the creditor status of Defendant. Such status in this is demonstrated below, because every finance contract entered into by Defendant by its own terms extends credit to a purchaser. The subsequent assignment of a finance contract to a "real" financing institution does not change the fact that Defendant is the originating creditor in every transaction.

### B. *Material Facts Claimed to be Undisputed*

3.  On November 3, 2004, the Court granted Plaintiff's motion to compel, which

requested production of all retail installment contract forms, currently used by Defendant.

Exhibit A, ECF Notice of November 3, 2004.

4.  On December 28, 2004, Defendant produced the forms, which are attached to this

Motion as Group Exhibit B.[1]

5.  Each form used by Defendant contains the following credit-granting language:

- "Seller and Creditor," "on a time price basis", Group Exhibit B, page 1 (CEFCU form);

- "until paid in full in installments as set forth in the Truth-in-Lending Disclosure, below.  Interest is included", Group Exhibit B, page 2 (unidentified form);

- "for the deferred payment price," Group Exhibit B, page 3 (ILLIANA FINANCIAL form);

- "Creditor (Seller Name and Address)", "you agree to buy the vehicle on credit", Group Exhibit B, page 4 (GMAC form).

In addition, every form contains appropriate TILA boxes for the actual credit terms.

6.  Defendant always puts its name under the "Seller and Creditor" heading in finance

contracts.  See Strohmaier Contract, Exhibit D.[2]

### C. *Argument*

7.  A "creditor" under the Act is a person who "***regularly extends***, renews, or continues

*credit.*"  15 U.S.C. §1691a(e).  The term "credit" under the Act means:

> the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefore.

---

[1] Group Exhibit B is supported by a Declaration of Dmitry N. Feofanov, Exhibit C.  Because these documents were received from Defendant, they are admissions against interest.

[2] Exhibit D is authenticated by a Declaration of Robert Strohmaier, Exhibit E.  Because this document was received from Defendant, it is an admission against interest.  Further, being an executed contract, it is a document of independent legal significance.

15 U.S.C. §1691a(d).

8. Each of the finance contract forms, produced by Defendant, by its own terms, extends credit. Thus, under the plain language of Defendant's own contracts, Defendant is a person who actually extends credit. Defendant extends credit "regularly," because Group Exhibit B contains all the finance contract forms used by Defendant.

9. Therefore, Defendant is a "creditor". Treadway v. Gateway Chevrolet Oldsmobile Inc., 362 F.3d 971, 980 (7th Cir. 2004) (describing how a person becomes a creditor "at some point along" the continuum of participation from no participation to final decision making); Cannon v. Metro Ford, Inc., 242 F.Supp.2d 1322, 1330 (S.D. Fla. 2002) ("Yet the RISC [retail installment sales contract] itself, drafted by Defendant, identifies Defendant Metro Ford, Inc. as the 'Creditor,' and the ECOA definition of 'creditor' is not limited to participation in the decision to extend credit."); Nevarez v. O'Connor Chevrolet, Inc., 2005 WL 675824 (N.D. Ill. 2005) (attached hereto as Exhibit F for the convenience of the Court):

> Finally, Plaintiffs also argue that O'Connor is a creditor under the notice provisions because O'Connor actually extended credit to Mr. Nevarez when he signed the May 5, 2001 contract and left with the Mountaineer. *** Plaintiffs rely on a point made in this court's previous opinion, specifically, that nowhere in the May 5, 2001 contract does it indicate that any entity other than O'Connor is the creditor for purposes of the transaction See Nevarez, 303 F.Supp.2d at 939.

Nevarez, 2005 WL 675824, at *7. See also id. at *8, n.17:

> The terms of the May 5, 2001 contract are not set out as an "application" for credit; those terms appear to be a credit contract that O'Connor could have enforced against Plaintiffs.... [T]he terms of the May 5, 2001 contract set out an agreement under which O'Connor was extending credit to Plaintiffs pursuant to the financing terms set forth in the contract. Thus, when O'Connor could not find another lender to whom it could assign the contract, presumably O'Connor could have financed the transaction itself.

3

**WHEREFORE**, Plaintiff requests that the Court:

A. Enter an order under F.C.R.P. 56(d), specifying that Defendant is a "creditor" under the Act; and

B. Grant Plaintiff other relief the Court deems appropriate and just.

**DAVID STROHMAIER**

s/ Dmitry Feofanov
Bar Number:  6224899
Attorney for Plaintiff

CHICAGOLEMONLAW.COM
1639 Brandywine Lane
Dixon, Illinois  61021
Telephone:  815/288-3217
Facsimile:  815/288-3235
Email:  Feofanov@ChicagoLemonLaw.com

**Certificate of Service**

I hereby certify that on April 1, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

None,

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

Mr. Gerald L. Hall
524 Court Street
Pekin, IL  61554

s/ Dmitry Feofanov
Bar Number: 6224899
Attorney for Plaintiff

CHICAGOLEMONLAW.COM
1639 Brandywine Lane
Dixon, Illinois  61021
Telephone:  815/288-3217
Facsimile:  815/288-3235
Email:  Feofanov@ChicagoLemonLaw.com

5

## Dmitry Feofanov

| | |
|---|---|
| **From:** | <ECF_Returns@ilcd.uscourts.gov> |
| **To:** | <ECF_Notices@ilcd.uscourts.gov> |
| **Sent:** | Wednesday, November 03, 2004 3:30 PM |
| **Subject:** | Activity in Case 1:04-cv-01106-JAG Strohmaier v. Ray Dennison Chev "Order on Motion to Compel" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Central District of Illinois

Notice of Electronic Filing

The following transaction was received from KB, ilcd entered on 11/3/2004 at 3:30 PM CST and filed on 11/1/2004

| | |
|---|---|
| **Case Name:** | Strohmaier v. Ray Dennison Chev |
| **Case Number:** | 1:04-cv-1106 |
| **Filer:** | |
| **Document Number:** | |

**Docket Text:**
Minute Entry for proceedings held before Judge John A. Gorman: Attys Feofanov/Hall present via phone for Status/Motion Hearing at 11:30 AM on 11/1/2004 re [6] MOTION to Compel. Motion to Compel [6] is granted. Counsel to produce documents within 28 days. Atty Feofanov to file "Notice" of Bankruptcy (abandonment of claim). Court sets the following schedule: Final Pretrial Conference set for 5/19/2005 at 10:00 AM and Jury Trial set for 6/6/2005 at 09:00 AM before Magistrate Judge John A. Gorman. (KB, ilcd)

The following document(s) are associated with this transaction:

### 1:04-cv-1106 Notice will be electronically mailed to:

Dmitry N Feofanov    feofanov@chicagolemonlaw.com, sstteepphh11@yahoo.com

### 1:04-cv-1106 Notice will be delivered by other means to:

Gerald L Hall
324 Court Street
Pekin, IL 61554

$Ex. A$

1/2/2005

CMFI GROUP PEORIA, IL (309) 692-9191  122 (5/04)

**CEFCU®**
P.O. Box 1715
Peoria, IL 61656

(ASSIGNEE)

**RETAIL INSTALLMENT CONTRACT**
**(Motor Vehicle)**
SIMPLE INTEREST

ACCOUNT NUMBER

AMOUNT OF LOAN          DATE

Seller and Creditor, Corporate, Firm, or Trade Name and Business Address

Buyer (and Co-Buyer) — Name and Residence Address (include: County, Zip Code, Phone and Social Security No.)

Motor Vehicle Retail Installment Contract Buyer (which means the undersigned Buyers and Co-Buyers, jointly and severally) having been quoted both a time sale price and a lesser cash price hereby purchases from Seller and Seller hereby sells to Buyer on a time price basis, upon the terms and conditions set forth on the face and reverse sides hereof, the following property (herein called the "Property") delivery and acceptance of which in good order hereby are acknowledged by Buyer.

| NEW OR USED | YEAR AND MAKE | SERIES | BODY STYLE | NO. CYL. | TRUCK TON CAPACITY | MANUFACTURER'S SERIAL NUMBER | IGNITION KEY NUMBER | COLOR | PROPOSED USE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | ☐ Personal |
| | | | | | | | | | ☐ Business |
| | | | | | | | | | ☐ Agriculture |

☐ Automatic Trans    ☐ Power Steering    ☐ Power Seat    ☐ Air Conditioner    ☐ Stereo    ☐ Fuel Injection
☐ 4 Speed    ☐ Power Brakes    ☐ Power Windows    ☐ Radio    ☐ Bucket Seats    ☐ ACC Group No. _____
☐ Cruise Control    ☐ Diesel    ☐ T-Top    ☐ Tape Deck    ☐ Sunroof    ☐

**ALL DISCLOSURES ARE MADE BY SELLER**

**ITEMIZATION OF THE AMOUNT FINANCED**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. | TOTAL SALE PRICE The total cost of your purchase on credit, including your downpayment of |
|---|---|---|---|---|
| % | $ | $ | $ | $ |

$ _____  Cash Price

$ _____  Less cash down payment

$ _____  Less trade-in

$ _____  Unpaid balance of cash price

$ _____  Prior balance this Seller

$ _____  Documentary fee

Your payment schedule will be:

| NO. OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| | | |

**AMOUNTS PAID TO OTHERS ON YOUR BEHALF**

Pay-off of prior loan    $ _____
To _____
License, title and taxes

**CREDIT INSURANCE:** Credit Life and Credit Disability Insurance is voluntary and not required to obtain this loan and will not be provided unless you sign and agree to pay the additional cost. Please read the complete Credit Insurance Application and Certificate on the "Debtor Copy" prior to signing this authorization.

$ _____  to _____
$ _____  to _____

| TYPE | PREMIUM | | COVERED MEMBER(S) |
|---|---|---|---|
| CREDIT LIFE ☐ Single ☐ Joint | $ | I/We want Credit Life Insurance. | Signature(s) |
| CREDIT DISABILITY ☐ Single ☐ Joint | $ | I/We want Credit Disability Insurance. | Signature |
| | | | Signature |

$ _____  to _____
$ _____  to _____
$ _____  to _____

$ _____  Amount Financed

**DESCRIPTION OF TRADE-IN**

_____ (Year and Make)

**NOTE:** Two signatures are required if Joint Coverage is selected.

You may obtain property insurance from any insurer you choose that is acceptable to CEFCU

_____ (Serial Number)

**Security:** You are giving a security interest in the goods or property being purchased and in your shares and/or deposits in CEFCU. Collateral securing other loans with CEFCU may also secure this loan.

$ _____ (Gross Allowance)

**Late Charge:** If any payment is ten (10) days late, you may be charged $10.00 or 5% of the payment whichever is less.

$ _____ (Amount Owing)

**Prepayment:** If you pay off early, you will not have to pay a penalty.

See your contract terms on face and reverse side for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

*Ex. B*

**For details of possible refund for Credit Life or Credit Disability, see notice on reverse side.**

**LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED.**

**NOTICE OF PROPOSED GROUP CREDIT LIFE INSURANCE**

If a charge is made in the ITEMIZATION OF AMOUNT FINANCED for credit life insurance and if such insurance is to be procured by Seller or Assignee, the undersigned takes notice that decreasing term insurance written under a Group Credit Life Insurance Policy is to be purchased on the life of the Buyer(s) whose signature(s) appear above, subject to acceptance by the Insurer and issuance of a certificate by

CUNA MUTUAL INSURANCE SOCIETY, P.O. Box 391, 5910 Mineral Point Road, Madison, WI 53701-0391

_____
(Insurer)

_____
(Home Office Address)

SEE CREDIT LIFE INSURANCE ON REVERSE SIDE OF BUYER'S COPY

| | Loan Number _____ |
|---|---|
| | Date _____ |
| | Maturity Date _____ |
| | Loan Amount $ _____ |
| | Renewal Of _____ |

**LENDER'S NAME AND ADDRESS**
"You" means the Lender, its successors and assigns.

**BORROWER'S NAME AND ADDRESS**
"I" includes each Borrower above, jointly and severally.

**TERMS FOLLOWING A** ☐ **APPLY ONLY IF CHECKED**

NOTE - For value received, I promise to pay to you, or your order, at your address above, the principal sum of: _____
_____ Dollars $ _____
plus interest at the rate of _____ % per year until paid in full in installments as set forth in the Truth-In-Lending Disclosure, below. Interest is included in the installment payments. I agree to pay a late charge on any late payment as set forth in the Truth-In-Lending Disclosure, below.

☐ **POST-MATURITY INTEREST** - Interest will accrue at the greater rate of the contract rate or _____ % per year on the balance of this note not paid at maturity, including maturity by acceleration.

**SECURITY** - To secure payment of this note and any and all extensions or renewals thereof in whole or in part and any and all my other liabilities and obligations, direct or contingent, to you, I grant and pledge to you a lien upon and a security interest in all shares I have with you and a security interest in the property hereinafter listed, with all attachments, accessories, equipment, additions and accessions now or hereafter attached or appertaining thereto. This security interest shall extend to any property now owned or hereafter acquired. This security interest shall not apply to shares in an Individual Retirement Account or any other account that would lose special tax treatment under state or Federal law if given as security.

ONE _____ MAKE/MODEL _____

YEAR _____ SERIAL _____

OTHER PROPERTY _____            REQUIRED SHARE BALANCE $ _____

The security interest in the property given herein, in addition to securing all presently existing debts and liabilities, secures all future advances made by you to or for my account, including advances for additional loans, repairs or maintenance of the property, taxes or assessments levied on property, premiums for insurance of property and all reasonable costs and expenses, including reasonable attorney's fees, court costs and/or collection agency fees and costs, incurred in the collection of all indebtedness hereby secured, as stated above.

## TRUTH-IN-LENDING DISCLOSURE

| ANNUAL PERCENTAGE RATE The cost of my credit as a yearly rate. | FINANCE CHARGE "e" The dollar amount the credit will cost me. | AMOUNT FINANCED The amount of credit provided to me or on my behalf. | TOTAL OF PAYMENTS "e" The amount I will have paid when I have made all scheduled payments. |
|---|---|---|---|
| _____ % | $ _____ | $ _____ | $ _____ |

I have the right to receive at this time an itemization of the Amount Financed.
☐ I want an itemization.    ☐ I do not want an itemization.

*(Complete only when CU is seller & lender)*

**Total Sales Price**
The total cost of my purchase on credit, including
my downpayment of $ _____

**My Payment Schedule will be:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |
| | $ | |

"e" means an estimate.

**Security** - I am giving a security interest in:
☒ the goods or property being purchased.
☒ collateral securing other loans with you may also secure this loan.
☒ my share accounts and other rights to the payment of money from you.
☐ brief description of other property, identified by item or type): _____

☒ **Late Charge** - I will be charged a late charge on any payment made more than 30 days after it is due in the amount of $20.

**Required Deposit** - The annual percentage rate does not take into account my required deposit.

**Prepayment** - If I pay off this note early, I will not have to pay a penalty.

**Filing fees** $ _____            **Non-filing insurance** $ _____

I can see my contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

**CREDIT INSURANCE** - Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless I sign and agree to pay the additional costs.

| Type | Premium | Term |
|---|---|---|
| Credit Life | | |
| Credit Disability | | |
| Joint Credit Life | | |

I ☐ do not want credit life insurance.
I ☐ do want credit disability insurance.
I ☐ do want joint credit life insurance.
I ☐ do want _____ insurance.
X _____            DOB _____
            DOB _____

**ITEMIZATION OF AMOUNT FINANCED**

1. Cash Price (excluding Sales Tax) _____ $ _____
2. Down Payment Computation
   Description of Trade-In _____
   | | | |
   |---|---|---|
   | (a) Gross Trade-In Allowance | $ _____ | |
   | (b) Pay-Off (if any) | $ _____ | |
   | (c) Net Trade-In (a minus b) | $ _____ | |
   | (d) Cash Down Payment | $ _____ | |
   | (e) Total Down Payment (c plus d) | $ _____ | |
3. Unpaid Balance of Cash Price (1 minus 2 (e)) _____ $ _____
4. Other Charges
   (a) To Insurance Companies _____ $ _____
   (b) To Public Officials _____ $ _____

tor Vehicle Retail Installment Contract — Illinois — with
nple Interest—Fixed Rate

ck Form No. IFI-26 (Rev. 11/99)
pyright 1989, ILLIANA FINANCIAL, INC. Elmhurst, IL and
INOIS BANKERS ASSOCIATION, Chicago, IL (All Rights Reserved)

Reorder from ILLIANA FINANCIAL, INC. P.O. Box 1127
Elmhurst, IL 60126, (630) 941-3838

This form Approved by
The Illinois Bankers Association

## RETAIL INSTALLMENT CONTRACT — MOTOR VEHICLE — SIMPLE INTEREST

No. _____

**Itemization of Amount Financed**

### FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your downpayment of |
|---|---|---|---|---|
| % | $ | $ | $ | $ _____ |
| | | | | $ _____ |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | $ | monthly beginning |
| | $ | |

**Security:** You are giving a security interest in the goods being purchased and in any moneys, credits or other property of yours in the possession of the Assignee, on deposit or otherwise.

**Late Charge:** If any payment is ten (10) days late, you will be charged: i) 5% of the installment if the installment is in excess of $200.00; or ii) $10.00 if the installment is for $200.00 or less.

**Prepayment:** You have the right to prepay the unpaid balance in full or in part at anytime without penalty.
See your contract terms below and on the reverse side for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties and further information about security interests.

Cash Price  $ _____
Less Cash Downpayment  $ _____
Value of  **Trade-In**
Trade $ _____
Lien Payoff $ _____
_____ Net
To:  Trade $ _____
**Amounts Paid on Your Account**
Unpaid Balance of
Cash Price  $ _____
**Amount Paid to Others for You**
*WE MAY BE RETAINING A PORTION OF THIS AMOUNT
Unpaid Balance
Due on Trade-In  $ _____

Year, Make, Model of Buyer's Trade-In

(Paid to)

*Insurance Companies:
• _____  $ _____
• _____  $ _____
• _____  $ _____

Public Officials
(Licenses, Title & Taxes)  $ _____
• To  $ _____
• To  $ _____
• To  $ _____
• To  $ _____

Buyer(s) _____
          (Names)          (Residence Address)          (City)    (State)    (Zip)

Buyer(s) _____
          (Names)          (Residence Address)          (City)    (State)    (Zip)

Seller _____
          (Corporate Firm or Trade Name)          (Business Address)          (City)    (State)    (Zip)

Seller hereby sells and Buyer or Buyers, jointly and severally, hereby purchase the following motor vehicle with accessories and equipment thereon for the deferred payment price and on the terms set forth in this contract. Buyer acknowledges delivery and acceptance of said motor vehicle in good condition.

| New or Used | Year | Make of Vehicle | Model | Body Style | No.Cyl. | Serial Number | Body Color | Top Color | Key No. |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |

**Buyer Promises to pay to the order of Seller at the offices of:** _____ , Illinois
(Assignee) located in _____  %

the Amount Financed shown above together with a Finance Charge on the principal balance of the Amount Financed from time to time unpaid at the rate of _____ , beginning on per annum from date until maturity in _____ installments of $ _____ each and a final installment of $ _____ and continuing on the same day of each successive month thereafter until fully paid. All payments shall be applied first to accrued Finance Charge and the balance to principal. The Finance Charge has been computed on the scheduled unpaid balances of the Amount Financed on the assumption that all scheduled installments will be paid when due. Guarantor, if any, guarantees collection of all amounts due under this contract upon failure of the Seller to collect from the Buyer named herein.

SECURITY INTERESTS: Seller is granted a purchase-money security interest in the motor vehicle described above and all accessories under the Illinois Uniform Commercial Code until the Total of Payments and all future indebtedness for taxes, liens, repairs and insurance premiums advanced by holder hereunder are paid in full. Buyer grants assignee the right of set-off or lien on any moneys, credits or other property of Buyer in possession of the Assignee, on deposit or otherwise, excepting IRA or similar deposits. Seller is also granted a security interest in any premium rebates for insurance or service contracts if financed hereunder, in the proceeds of any insurance or service contract on the motor vehicle, and in the proceeds of any credit life and/or accident and health insurance financed hereunder, until all amounts due under this contract are paid in full.

ACCELERATION: Buyer agrees that ( 1 ) if Buyer shall default in the payment of any installment of the Total of Payments or any other indebtedness due hereon; or (2) Buyer shall fail to perform any agreement or warranty made by Buyer herein; or (3) if the motor vehicle shall be lost, stolen, substantially damaged, destroyed, sold, encumbered, removed, concealed, attached or levied upon; or (4) if the motor vehicle shall be seized or forfeited for violation of any law or ordinance, State, Federal or Municipal; or (5) a proceeding under any bankruptcy or insolvency statute shall be instituted by or against Buyer or Buyer's business or property, or Buyer shall make an assignment for benefit of creditors, or (6) if Buyer shall die or be adjudged incompetent; or (7) if holder shall, for reasonable cause, deem itself insecure; or (8) if Buyer shall fail to keep the motor vehicle fully insured for the entire term of this contract, the holder may declare all unpaid installments of the Total of Payments and all other indebtedness secured hereby immediately due and payable, without notice or demand.

PREPAYMENT: THE BUYER MAY PREPAY IN FULL OR IN PART THE UNPAID BALANCE OF THE CONTRACT AT ANY TIME WITHOUT PENALTY.
DELINQUENCY CHARGE: If any payment is ten (10) days late, you will be charged: i) 5% of the installment if the installment is in excess of $200.00; or ii) $10.00 if the installment is for $200.00 or less. In addition, Buyer agrees to pay reasonable attorneys' fees, costs and expenses incurred in the collection or enforcement of the debt or in realizing on the collateral. Buyer agrees to pay Finance Charges after maturity of the final installment, or after acceleration upon default, at the Annual Percentage Rate stated herein so long as there exists any uncured default hereunder, and without relief from valuation or appraisement laws.

INSURANCE AGREEMENT: Motor Vehicle Damage or Loss insurance is required by Seller. **(Buyer may choose the person through whom the insurance is to be obtained**
_____  months will be $ _____

# RETAIL INSTALLMENT CONTRACT

## GMAC FLEXIBLE FINANCE PLAN

Dealer Number        Contract Number

Buyer (and Co-Buyer) - Name and Address (Include County and Zip Code)        Creditor (Seller Name and Address)

You, the Buyer (and Co-Buyer, if any), may buy the vehicle described below for cash or on credit. By signing this contract, you agree to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor the Amount Financed and Finance Charge according to the payment schedule shown below. The Finance Charge is figured on a daily basis at the Annual Percentage Rate on the unpaid balance of the Amount Financed.

Description of Vehicle. You agree to buy and the Creditor agrees to sell the following vehicle:

| New or Used | Year | Make and Model | Body Type | Vehicle Identification No. | Use for Which Purchased |
|---|---|---|---|---|---|
| | | | | | ☐ personal  ☐ agricultural  ☐ business  ☐ |

If truck - Describe body and major items of equipment sold:

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down-payment of $_____ is |
|---|---|---|---|---|
| _____ % | $ | $ | $ | $ |

Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due | Or as Follows: |
|---|---|---|---|
| | | Monthly beginning | |

Late Charge. If a payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late, with a minimum charge of $10.

Prepayment. If you pay off all your debt early you will not have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information: See the other side of this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, and security interest.

$_____ (1)

## ITEMIZATION OF AMOUNT FINANCED

1 Cash Price (including any accessories, services, and taxes)

2 Total Downpayment = (If negative enter "0" and see line 4J below)

   Gross Trade-in $_____    - Payoff by seller $_____

   = Net Trade-in $_____    + Cash $_____

   + Other (Describe) _____    $_____ (2)

   Your Trade-in is a _____ $_____ (3)
   Year    Make    Model

3 Unpaid Balance of Cash Price (1 minus 2)

4 Other Charges Including Amounts Paid to Others on Your Behalf: (Seller, holder, or their affiliates may be keeping part of these amounts.)

  A Cost of Required Physical Damage Insurance Paid to the Insurance Company Named Below - Covering Damage to the Vehicle    $_____

  B Cost of Optional Mechanical Repair Insurance Paid to the Insurance Company Named Below - Covering Certain Mechanical Repairs    $_____

  C Cost of Optional Credit Insurance Paid to the Insurance Company or Companies Named Below.
    Life $_____    Disability, Accident and Health $_____    $_____

  D Official Fees Paid to Government Agencies    $_____

  E Taxes Not Included in Cash Price    $_____

  F Government License and/or Registration Fees (Itemize)    $_____

  G Government Certificate of Title Fees

  H DOCUMENTARY FEE. A DOCUMENTARY FEE IS NOT AN OFFICIAL FEE. A DOCUMENTARY FEE IS NOT REQUIRED BY LAW, BUT MAY BE CHARGED TO BUYERS FOR HANDLING DOCUMENTS AND PERFORMING SERVICES RELATED TO CLOSING OF A SALE. THE BASE DOCUMENTARY FEE BEGINNING JANUARY 1, 1992, WAS $40. THE MAXIMUM AMOUNT THAT MAY BE CHARGED FOR A DOCUMENTARY FEE IS THE BASE DOCUMENTARY FEE OF $40 WHICH SHALL BE SUBJECT TO AN ANNUAL RATE ADJUSTMENT EQUAL TO THE PERCENTAGE OF CHANGE IN THE BUREAU OF LABOR STATISTICS CONSUMER PRICE INDEX. THIS NOTICE IS REQUIRED BY LAW.    $_____

  I Other Charges (Seller must identify who will receive payment and describe purpose)    $_____
    for

4

## Declaration of Dmitry Feofanov

I, Dmitry Feofanov, under penalty of perjury, as provided for by the laws of the United States (28 U.S.C. §1746), declare that the following statements are true:

1. I am one of the attorneys for the Plaintiff in this action.

2. I submit this Declaration in support of Plaintiff's Motion for Partial Summary Judgment on the issue of "creditor" status of Defendant.

3. Attached to Plaintiff's Motion as Group Exhibit B are true and accurate copies of documents received from Defendant pursuant to the Court order granting Plaintiff's First Motion to Compel.

April 1, 2005

6

Ex. C

ROBERT P. SCHUMAKER

YATES CITY IL 61572 6409

2005      2ND
MEN   CHEVROLET   AVALANCHE    8            3GNEC13T75G345613        SUMMIT WHIT

ALL DISCLOSURES ARE MADE BY SELLER

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS | TOTAL SALE PRICE |
|---|---|---|---|---|
|  |  |  |  | 5500.00 |
| 9.25 | 4074.83 | 29975.25 | 34012.00 | 39512.00 |

72      472.33    MONTHLY BEGINNING 10/08/04

N/A

N/A



Ex. D

## Declaration of Robert Strohmaier

I, Robert Strohmaier, under penalty of perjury, as provided for by the laws of the United States (28 U.S.C. §1746), declare that the following statements are true:

Attached to this Declaration is a true and accurate copy of the finance contract I received from Ray Dennison Chevrolet.

*Robert J. Strohmaier*                    April 1, 2005

6

Ex. E

CEFCU
PO Box 1715
Peoria, IL 61656

RETAIL INSTALLMENT CONTRACT
(Motor Vehicle)
SIMPLE INTEREST

34012.08    05/08/03

ROBERT E STRONGWELL
414 E MAIN STREET PO B 32
YATES CITY IL 61572 KNOX

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    RAY DENNISON CHEVROLET, INC.
(309)245-4198    2217 N 8TH STREET
PEKIN, IL 61554

2003    CHEVROLET   240    S731C      RX
NEW              AVALANCHE   9   3GNEC13173G346613   SUMMIT WHITE

ALL DISCLOSURES ARE MADE BY SELLER

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS | TOTAL SALE PRICE |
|---|---|---|---|---|
| 4.25 | 4036.83 | 29975.25 | 34012.08 | 39512.08 |

| | | |
|---|---|---|
| 72 | 472.39 | MONTHLY BEGINNING 10/08/03 |

32788.00
5500.00
N/A
27288.00
N/A
N/A

2192.25
N/A
N/A
N/A
495.00   JM&A
29975.25

N/A
N/A

For details of possible refund for Credit Life or Credit Disability, see notice on reverse side.

NOTICE OF PROPOSED GROUP CREDIT LIFE INSURANCE

N/A

472.39    4.25    71    472.39
OCT 8th    03

*Westlaw.*

Slip Copy                                               Page 1
2005 WL 675824 (N.D.Ill.)
**(Cite as: 2005 WL 675824 (N.D.Ill.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Jesus and Leticia NEVAREZ, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
O'CONNOR CHEVROLET, INC. and Evergreen Finance Company, Defendants.
**No. 02 C 3568.**

March 21, 2005.
Lance A. Raphael, Allison Amy Krumhorn, Stacy Michelle Bardo, Consumer Advocacy Center, Chicago, IL, Dmitry N. Feofanov, Chicago Lemon Law.Com, Dixon, IL, for Plaintiffs.

Julie Line Bailey, Brian Thomas Bailey, Bailey & Bailey, Richard J. Sorman, Sorman & Frankel, Ltd., Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

BROWN, Magistrate J.

**\*1** Defendants O'Connor Chevrolet, Inc. ("O'Connor") and Evergreen Finance Company ("Evergreen") (collectively, "Defendants") move for summary judgment against Plaintiffs Jesus and Leticia Nevarez (collectively, "Plaintiffs") on Count II of the Second Amended Class Action Complaint. [Dkt 78.] Defendants also request dismissal of Counts III through VII if summary judgment is granted on Count II. Summary judgment was previously granted in favor of Defendants on Count I of the complaint and denied as to Count II. *Nevarez v. O'Connor Chevrolet, Inc.,* 303 F.Supp.2d 927, 933-36 (N.D.Ill. Feb.5, 2004) (Brown, M.J.). [Dkt 75.] The parties have

consented to the jurisdiction of a Magistrate Judge. [Dkt 7, 8.] For the reasons set out below, Defendants' motion for summary judgment on Count II is again denied, and Defendants' request to dismiss Counts III through VII is moot. [FN1]

> FN1. This opinion refers to Defendants collectively, because both O'Connor and Evergreen moved for summary judgment on Count II and requested dismissal of Counts III through VII. However, since Count II was brought only against O'Connor, the summary judgment ruling is directed towards and affects only O'Connor.

JURISDICTION
The court has original jurisdiction over Count II and supplemental jurisdiction over Counts III through VII. *See Nevarez,* 303 F.Supp.2d at 929- 30.

FACTUAL BACKGROUND [FN2]

> FN2. The following facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pls.' LR Resp. ¶ ___" [dkt 89], "Defs.' LR Resp. ¶ ___" [dkt 93], and from the exhibits submitted with those statements or responses to those statements, which are cited herein as: "Pls.' LR Ex. ___" [dkt 89] and "Defs.' LR Ex. ___" [dkt 78]. The facts recited are those relevant to the present motion for summary judgment. For additional discussion of the factual background of this case, see *Nevarez,* 303 F.Supp.2d at 930-32.

Jesus and Leticia Nevarez reside in Chicago, Illinois. (Pls.' LR Resp. ¶ 1.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*EX, F*

2005 WL 678503
--- F.Supp.2d ---
**(Cite as: 2005 WL 678503 (N.D.Ill.))**

O'Connor is a car dealership located in Alsip, Illinois. (Pls.' LR Resp. ¶ 2.) On approximately April 10, 2001, Leticia Nevarez contacted O'Connor via telephone in response to a Spanish-language advertisement she had seen, asked for a representative who spoke Spanish and was connected to Juan Soto ("Soto"). (2nd Am. Compl. ¶ ¶ 7-8 [dkt 53]; Pls.' LR Stmt. ¶ 3; Defs.' LR Resp. ¶ 7; Defs.' LR Ex. B, Leticia Nevarez Dep. at 33-37.) According to Leticia Nevarez, the advertisement stated that O'Connor financed everybody, no matter what kind of credit they had. (L. Nevarez Dep. at 35.) __[FN3]__ During that conversation, Leticia Nevarez told Soto that she wished to purchase a car and provided Soto with her social security number, income and address. (2nd Am. Compl. ¶ 9; L. Nevarez Dep. at 37.) Soto accessed Leticia Nevarez's credit report during their conversation and informed Ms. Nevarez that she was approved for $20,000 to $25,000 if she made a down payment of $3,000 to $5,000. (Pls.' LR Resp. ¶ 6; Defs.' LR Resp. ¶ ¶ 7, 8; L. Nevarez Dep. at 36-38.)

> FN3. O'Connor admits to having prepared flyer advertisements stating "Recuerde, Nosotros Financiamos A Todos" ("Remember, we finance everyone"), "Nosotros le revisamos su creditor GRATIS" ("We review your credit for free"), and "Not able to be financed at another place? Here you can!" (Defs.' LR Resp. ¶ ¶ 4-6.) The actual Spanish advertisements do not contain the English translations that are stated here. (Defs.' LR Resp. ¶ ¶ 4-5.)

A few weeks later, in early May 2001, Plaintiffs met with Soto at O'Connor and began looking at the selection of cars. (Pls.' LR Resp. ¶ 6; L. Nevarez Dep. at 34, 40-42.) Soto informed Plaintiffs that they did not qualify for a Tahoe, so Plaintiffs selected a 1999 Mercury Mountaineer (the "Mountaineer"). (Pls.' LR Resp. ¶ ¶ 7, 8; L. Nevarez Dep. at 42-44.) Plaintiffs assert that Soto (or someone else from O'Connor) evaluated Ms. Nevarez's credit again while they were there, and then orally advised Ms. Nevarez that O'Connor could not finance her for the Mountaineer, either. (Pls.' LR Stmt. ¶ 9; Pls.' LR Resp. ¶ 7; L. Nevarez Dep. at 54-55.)

When Plaintiffs became upset over the news, Soto advised Leticia Nevarez that they might be able to obtain financing for the car if her husband applied, provided his credit report was sufficient. (L. Nevarez Dep. at 55-56.) __[FN4]__ O'Connor admits for purposes of this motion that it examined Jesus Nevarez's credit report in connection with the Mountaineer transaction on May 4, 2001. (Defs.' LR Resp. ¶ 12.) After that review, Jesus Nevarez signed a retail installment contract for the purchase of the Mountaineer on May 5, 2001 (the "May 5, 2001 contract"). (Pls.' LR Resp. ¶ 8; Defs.' LR Resp. ¶ ¶ 12, 13; Defs.' LR Ex. C, May 5, 2001 Contract.) After signing the May 5, 2001 contract, Plaintiffs left O'Connor with the Mountaineer. (Defs.' LR Resp. ¶ 14.) __[FN5]__

> FN4. Specifically, Plaintiffs allege that Soto stated that "he could get them the price they wanted, and the best interest rate, and only Jesus Nevarez needed to sign the contract." (2nd Am.Compl.¶ 13.) Defendants deny that allegation. (Answer 2nd Am. Compl. ¶ 13.)

> FN5. As mentioned above, the record indicates that O'Connor checked Jesus Nevarez's credit on May 4, 2001, but did not sign a contract with Mr. Nevarez until May 5, 2001. It is unclear from the record how this came about. Possibly, the parties executed the contract on the 5th when Plaintiffs visited the dealership, but Soto had checked Jesus Nevarez's credit the day before. In any event, it is not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

material to resolving the present motion.

**\*2** In connection with Plaintiffs' attempt to purchase the Mountaineer, O'Connor, who regularly submits its customers' credit applications to financing institutions, submitted Jesus Nevarez's credit application to five financing companies: Nuvell, AmeriCredit, Onyx Acceptance, Household Automotive Finance, and Evergreen. (Pls.' LR Resp. ¶ 9; Defs.' LR Resp. ¶ 15.) On approximately May 7, 2001, three of the financing companies, Nuvell, AmeriCredit, and Onyx Acceptance, notified O'Connor that they had declined to extend Jesus Nevarez credit for the May 5, 2001 contract. (Pls.' LR Resp. ¶ ¶ 10-12; Defs.' LR Exs. E-G, Declination Notices.) Plaintiffs contend that Household Finance, however, conditionally approved the financing of the May 5, 2001 contract. (Pls.' LR Stmt. ¶ 17; Pls.' LR Resp. ¶ 13; Defs.' LR Ex. H, Household Finance Credit Determination.) Plaintiffs base their contention on the testimony of Rosann Cunningham, a senior credit officer with Household Finance, who testified at her deposition that Household would have purchased the deal if the May 5, 2001 contract had reflected certain terms. (Pls.' LR Resp. ¶ 13; Defs.' LR Resp. ¶ 24; Defs.' LR Ex. N, Rosann Cunningham Dep. at 6, 54-55; see also Household Finance Credit Determination.) [FN6] Defendants also asserted, initially, that Household Finance had conditionally approved the financing of the May 5, 2001 contract. See Defs.' LR Stmt. ¶ ¶ 13, 32. However, in their Response to Plaintiffs' Local Rule 56.1 Statement, filed after their own Local Rule 56.1 Statement had been filed, Defendants denied that Household Finance conditionally approved Mr. Nevarez's financing application. (Defs.' LR Resp. ¶ ¶ 17, 18.) Defendants disputed that point based on Ms. Cunningham's testimony that she initially declined to finance Jesus Nevarez. (Id.; Cunningham Dep. at 6, 31-32, 35, 58-59.) However, Ms. Cunningham also testified that after she

declined the application, Household Finance "conditional[ly] approv[ed]" the application for financing and held that offer open until June 5, 2001. (Cunningham Dep. at 36-38.) Ms. Cunningham stated that while she had declined the application on the morning of May 7, 2001, an "acceptance of a payment" was entered into Household's system a few hours later that day. (Id. at 35-38.) [FN7]

> FN6. Specifically, Ms. Cunningham testified that she would have approved the deal if it reflected: (1) monthly payments of $500.00, (2) a calendar of payments of 60 months or less, (3) a down payment of $5,000.00, and (4) mileage of less than 50,000 miles on the Mountaineer. (Pls.' LR Resp. ¶ 13; Defs.' LR Resp. ¶ 24; Cunningham Dep. at 54-55.) In addition, the Household Finance Credit Determination document appears to indicate that Household Finance would have required Leticia Nevarez as a co-borrower. (Household Finance Credit Determination; see also Cunningham Dep. at 27, 32-33, 37, 53.)

> FN7. According to Ms. Cunningham, a "conditional approval" means that the lender agrees to finance up to a certain maximum payment, based on a certain monthly payment that the consumer must be able to pay. (Cunningham Dep. at 22-23.) Ms. Cunningham further explained that with a conditional approval, the dealership must still submit a "full structure" payment (e.g., information regarding the specific deal, specific car, and specific amount financed), before the lender can provide final approval. (Id. at 23, 38.)

Plaintiffs claim that, on either May 18th

or 19th, Soto called Leticia Nevarez and told her that the financing on the May 5, 2001 contract was "not able to be sold to the bank, *i.e.* [as]signed to a third party lender." (2nd Am. Compl. ¶ 22; Defs' LR Resp. ¶ 20; L. Nevarez Dep. at 80.) Soto advised her that the application had been rejected because they "did not earn enough and [ ] because [they] needed another signature." (Defs.' LR Resp. ¶ 21; L. Nevarez Dep. at 80, 135-36.) Soto then told Ms. Nevarez that her husband would need to return to the dealership to sign a different contract, and that Mr. Nevarez would need a co-signer. (Defs.' LR Resp. ¶ 21; L. Nevarez Dep. at 80-81, 136.) Defendants admit that Ms. Nevarez so testified, and fail to cite any evidence to the contrary. (Defs.' LR Resp. ¶ 21.)

**\*3** On May 19, 2001, Plaintiffs returned to O'Connor with Ms. Nevarez's brother-in-law, Juan Huerta, who was willing to serve as a co-signer. (L. Nevarez Dep. at 81-83.) When they arrived, however, Soto allegedly told Plaintiffs that Mr. Huerta would not need to co-sign after all because he was able to get Plaintiffs financed through Evergreen, but they would need to provide an additional $3,000 for the down payment. (2nd Am. Compl. ¶ 25; L. Nevarez Dep. at 85, 88.) Plaintiffs then entered into a new retail installment contract (the "May 19, 2001 contract"), which was signed by both Leticia and Jesus Nevarez. (Defs.' LR Resp. ¶ 20; Pls.' LR Resp. ¶ 15; Defs.' LR Ex. J, May 19, 2001 Contract.) That contract was assigned to Evergreen, who remained the assignee of the May 19, 2001 retail installment contract and the holder of the consumer credit contract at all relevant times. (Defs.' LR Resp. ¶ 20; Pls.' LR Resp. ¶ 14; 2nd Am. Compl. ¶ 33; Answer 2nd Am. Compl. ¶ 33). [FN8] Defendants admit that the May 19, 2001 contract contained several different terms and at least one additional party which the May 5, 2001 contract did not have. (Defs.' LR Resp. ¶¶ 22-23.)

FN8. Caryl O'Connor, who is the

agent, President and Secretary of O'Connor, is also the agent and Secretary of Evergreen. (2nd Am. Compl. ¶ 33; Answer 2nd Am. Compl. ¶ 33.)

Plaintiffs assert that O'Connor never told them that the May 5, 2001 contract had been conditionally approved by Household Finance or that they had until June 5, 2001 to accept Household's offer. (Pls.' LR Stmt. ¶¶ 21, 25.) They assert that, instead, O'Connor simply terminated their May 5, 2001 contract when they could have obtained financing from Household Finance. (*Id.* ¶ 18.) Defendants deny that they failed to inform Plaintiffs of any conditional approval by Household Finance. (Defs.' LR Resp. ¶¶ 21, 25.) [FN9]

> FN9. Defendants' denial of this point is based on their position that Household Finance never conditionally approved the loan. *See* Defs.' LR Resp. ¶ 25.

On or about November 7, 2001, a representative from Evergreen contacted Leticia Nevarez by telephone and allegedly told her that she did not have insurance for the Mountaineer. (2nd Am.Compl.¶ 30.) Plaintiffs insist that they were never in default of their obligation to retain insurance for the Mountaineer. (*Id.* ¶ 31.) Evergreen allegedly repossessed the Mountaineer on or about November 13, 2001. (*Id.*) On November 17, 2001, Plaintiffs, through their counsel, allegedly revoked acceptance of the Mountaineer and rescinded their contract with O'Connor and Evergreen. (*Id.* ¶ 32.)

It is undisputed that O'Connor failed to provide Jesus Nevarez with a written statement of the reasons as to why his May 5, 2001 contract with O'Connor was terminated. (Defs.' LR Resp. ¶ 19.) [FN10] Although O'Connor does not dispute that it failed to provide Jesus Nevarez with a written statement of the reasons for the termination of the May 5,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 678503
--- F.Supp.2d ---
**(Cite as: 2005 WL 678503 (N.D.Ill.))**

2001 contract, it denies that O'Connor had a policy of not providing written notice to customers whose contracts were terminated. (*Id.* ¶ 26.) [FN11]

> FN10. Defendants state that this point is undisputed only for purposes of this motion for summary judgment. (Defs.' LR Resp. ¶ 19.)

> FN11. However, Karen Zimmerman, a finance manager who was employed by O'Connor for a period of four months, testified that she did not provide written notices to customers whose contracts were terminated detailing the reasons for such terminations. (Defs.' LR Resp. ¶ 26; Pls.' LR Ex. 8, Karen Zimmerman Dep. at 11-12, 13-14, 45-49.)

Plaintiffs asserted seven counts in their Second Amended Complaint. [FN12] Only Count II is at issue in this motion, which alleges that O'Connor violated the written notice requirements of the **Equal Credit Opportunity** Act ("ECOA"), 15 U.S.C. § 1691.

> FN12. As mentioned above, Count I was previously dismissed on summary judgment. [Dkt 75.] Count III alleges that O'Connor and Evergreen violated Section 2N of the Illinois **Consumer Fraud** Act. Count IV alleges that O'Connor violated Section 2C of the Illinois **Consumer Fraud** Act. Count V alleges that O'Connor and Evergreen made certain misrepresentations and omissions in violation of the Illinois **Consumer Fraud** Act. Count VI alleges that O'Connor delivered the car in violation of the Illinois **Consumer Fraud** Act and Deceptive Business Practices Act. Count VII alleges that Evergreen wrongfully repossessed the Mountaineer. (2nd Am.Compl.)

## LEGAL STANDARD

**\*4** The legal standards for summary judgment that were set out in the previous opinion are applied to the present motion. *See Nevarez,* 303 F.Supp.2d at 932-33.

## DISCUSSION

In Count II, Plaintiffs claim that O'Connor violated the ECOA by failing to notify them in writing of the reasons why financing under the May 5, 2001 contract was rejected. (2nd Am.Compl.¶ ¶ 57-59). The ECOA contains broad anti-discrimination provisions that make it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1). The ECOA also contains notice requirements, providing that an applicant for credit "against whom adverse action is taken" is entitled to a statement of the specific reasons for such an action from the "creditor." *Id.* § 1691(d). An aggrieved applicant may bring a civil action against "[a]ny creditor who fails to comply with any requirement imposed under [the ECOA]." *Id.* § 1691e(a).

Defendants' renewed motion for summary judgment on Count II is based on two arguments: (1) that O'Connor is not a "creditor" as that term is defined by the ECOA; and (2) that even if O'Connor is a creditor, it was not required to send an adverse action notice because Plaintiffs accepted and used credit from Evergreen. (Defs.' Mot. ¶ ¶ 5-7, 12-14; Defs.' Mem. at 3-4, 5-6.) [FN13]

> FN13. Defendants asserted a third argument in their motion for summary judgment, as well, namely, that O'Connor was not required to send an adverse action notice because the three creditors who declined to finance the May 5, 2001 contract sent notices to them directly. (Defs.' Mot. ¶ ¶ 8-11;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 678503
--- F.Supp.2d ---
**(Cite as: 2005 WL 678503 (N.D.Ill.))**

Defs.' Mem. at 4-5.) Defendants subsequently withdrew that argument. *See* Defs.' Reply at 2; Defs.' LR Resp. ¶ 1; *see also* Pls.' LR Ex. 1.

A. Whether O'Connor is a "creditor" under the notice provisions of ECOA.

In a reprise of their argument on the previous motion for summary judgment, Defendants argue that O'Connor is not a "creditor" under ECOA. Defendants cite a subsequent decision by the Seventh Circuit in *Treadway v. Gateway Chevrolet Oldsmobile, Inc., 362 F.3d 971 (7th Cir.2004)*. However, the *Treadway* decision does not change this court's view that there are questions of fact as to whether O'Connor was a "creditor" in a manner that would create liability in these circumstances, and thus, summary judgment cannot be granted for Defendants on this basis.

As discussed in this court's previous opinion, the ECOA defines the term "creditor" as:
any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.
15 U.S.C. § 1691a(e). The ECOA delegated to the Federal Reserve Board (FRB) the power to implement regulations in furtherance of carrying out the ECOA's purpose. *Id.* § 1691b(a). These regulations, known as "Regulation B," are found under 12 C.F.R. §§ 202.1-202.17 (2003). The term "creditor" is also defined by Regulation B:
Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit.... For purposes of § § 202.4(a) and (b) [prohibiting discrimination in credit decisions and discouragement from applying for credit], the term

creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made....
**\*5** 12 C.F.R. § 202.2(*l* ) (March 2003). [FN14] Comment 2 to § 202.2(*l* ), which is also known as an Official Staff Interpretation of Regulation B, explains that:

> FN14. Prior to April 15, 2003, Regulation B defined a "creditor" as "a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit." 12 C.F.R. § 202.2(*l* ) (Jan.2002). As the Seventh Circuit stated in *Treadway*, "[w]e do not view the subsequent amendment as a substantive change in the regulation but merely as a clarification.... Therefore, retroactive application of the amended regulation is not prohibited." 362 F.3d at 979 n. 7.

For certain purposes, the term *creditor* includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4(a), the general rule prohibiting discrimination, and with § 202.4(b), the general rule against discouraging applications.
12 C.F.R. Pt. 202, Supp. I, Section 202.2(*l* ) (March 2003). [FN15] The FRB elaborated on this comment in a final rule amending Regulation B, as follows:

> FN15. The FRB has authorized officials in the Division of Consumer and Community Affairs to issue official staff interpretations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 678503
--- F.Supp.2d ---
(Cite as: 2005 WL 678503 (N.D.Ill.))

of regulations and, except in unusual circumstances, such interpretations are incorporated in an official commentary to the regulation. 12 C.F.R. Pt. 202, App. D.

Comment 2(*l*)-2 is intended to clarify that where the only role a person plays is accepting and referring applications for credit, or selecting creditors to whom applications will be made, the person meets the definition of creditor, but only for purposes of the prohibitions against discrimination and discouragement. For example, an automobile dealer may merely accept and refer applications for credit, or it may accept applications, perform underwriting, and make a decision whether to extend credit. Where the automobile dealer only accepts applications for credit and refers those applications to another creditor who makes the credit decision-for example, where the dealer does not participate in setting the terms of the credit or making the credit decision-the dealer is subject only to § § 202.4(a) and (b) for purposes of compliance with Regulation B.
68 Fed.Reg. 13144, 13155 (March 18, 2003).

The *Treadway* court noted, "[T]here is 'a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the Act." ' 362 F.3d at 980 (quoting *Bayard v. Behlmann Automotive Servs., Inc.,* 292 F.Supp.2d 1181, 1186 (E.D.Mo.2003)). This court's previous opinion interpreted the regulatory definitions and agency interpretations as differentiating between two types of "creditors" based on the extent of their role in the credit decision: "referring creditors," who do not participate in the credit decision but merely refer applications to third-party credit

institutions, and "participating creditors," who accept applications and actually participate in setting the terms of credit or making the credit decision. *Nevarez,* 303 F.Supp.2d at 937-38. As discussed in the previous opinion, "referring creditors" are considered "creditors" in a limited sense and are subject only to the requirements set forth in § § 202.4(a) and (b), which prohibit discrimination and discouraging applications. *Id.* at 938. "Participating creditors" are required to comply with all of the statutory requirements, including § 202.4(d), which requires written notice of adverse action. *Id.*

**\*6** In *Treadway,* the Seventh Circuit found that an automobile dealer was a "creditor" for purposes of the ECOA's notice requirement because, among other factors, the dealer had decided not to send an applicant's credit application to any lender. 362 F.3d at 980. Thus, the court held that the dealer "not only 'participate[d]' in the decision of whether to extend credit--it ma[de] the decision itself." *Id.* Defendants argue that *Treadway* supports a finding that O'Connor is *not* a creditor under ECOA's notice provisions because, unlike the dealer in *Treadway,* O'Connor merely sent Mr. Nevarez's applications to third party creditors who, in turn, made their own credit decisions. (Defs.' Mot. ¶ 14; Defs.' Mem. at 6.)

Plaintiffs, on the other hand, argue that the *Treadway* decision supports *their* position. They argue that, like the dealer in *Treadway,* O'Connor is a creditor under the notice provisions because it "single-handedly decided to terminate Mr. Nevarez's May 5, 2001 contract, even though the contract was signed, Mr. Nevarez had already made the down payment, he received the vehicle contracted for, and the contract was enforceable." (Pls.' Resp. at 4-5.) Plaintiffs argue that, by doing so, O'Connor "effectively became the denier of credit," because, according to Plaintiffs, Mr. Nevarez could have obtained financing for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 678503
--- F.Supp.2d ---
**(Cite as: 2005 WL 678503 (N.D.Ill.))**

the May 5, 2001 contract through Household Finance. (*Id.* at 5, 9) (citing *Treadway,* 362 F.3d at 975.)

The *Treadway* decision does not change the conclusion that summary judgment cannot be granted to Defendants. The *Treadway* decision does not hold that the fact that O'Connor sent Mr. Nevarez's application to third party lenders requires the conclusion that O'Connor was not a participating creditor. Rather, O'Connor has not demonstrated that a reasonable fact finder could not conclude that O'Connor may have "effectively bec[o]me the denier of credit" by deciding to terminate Mr. Nevarez's May 5, 2001 contract. Although it is disputed, there is some factual support in the record for Plaintiffs' position that Household Finance had "conditionally approved" Mr. Nevarez's contract for financing, and that O'Connor never conveyed any such approval to Mr. Nevarez. Although it is not clear on the present record, Plaintiffs may be able to demonstrate that "conditional approval" would have become actual financing for Mr. Nevarez's purchase.

In addition, Plaintiffs have also presented evidence to support their position that O'Connor acted as a "participating creditor" by "restructuring the terms of the sale in order to meet the concerns of the creditor ... [by,][f]or instance, ... (a) insist[ing] on more money down; (b) request[ing] that the applicant find a cosigner; or (c) lower[ing] the price of the car," and "regularly set[ting] the [APR] associated with the sale," factors cited by the Seventh Circuit in finding that the dealership in *Treadway* was a creditor for purposes of the ECOA's notification requirements. 362 F.3d at 980. Plaintiffs cite the testimony of Sylvia Borchert, an employee of Nuvell (one of the financing companies who received Jesus Nevarez's credit application), that "the APR on the contract is ... what the dealership puts on the contract" and Nuvell had "nothing to do with [that] rate." (Pls.' Resp. at 9) (citing Pls.' LR Ex. 11, Sylvia Borchert

Dep. at 29.)

**\*7** Regarding O'Connor's participation by "restructuring the terms of the sale," Plaintiffs have presented evidence that O'Connor suggested or required several changes in the applications that were submitted by Plaintiffs to meet the concerns of third party lenders. For example, on May 5, 2001, Soto advised Plaintiffs that Jesus would be a better candidate for credit than Leticia (even though it was Leticia who had intended to apply), and then on May 19, 2001, Soto advised Plaintiffs that they would be better candidates together. (Pls.' LR Resp. ¶ 8; Defs.' LR Resp. ¶ 13; L. Nevarez Dep. at 55-56, 85; May 5, 2001 Contract; May 19, 2001 Contract.) Soto also advised Plaintiffs that an additional down payment would be necessary (L. Nevarez Dep. at 88; May 19, 2001 Contract); and, at one point, advised them that they would need a co-signer to complete the deal. (Defs.' LR Resp. ¶ 21; L. Nevarez Dep. at 80-83, 135-36.) While it is not clear whether it was O'Connor or a third party lender who suggested these changes, there is evidence in the record indicting that it may have been O'Connor. *See, e.g.,* Defs.' LR Resp. ¶ 10 (O'Connor denied Leticia Nevarez credit on May 5, 2001 before submitting her credit application to any third party lender); Borchert Dep. at 29.

Finally, Plaintiffs also argue that O'Connor is a creditor under the notice provisions because O'Connor actually extended credit to Mr. Nevarez when he signed the May 5, 2001 contract and left with the Mountaineer. (Pls.' Resp. at 8.) Plaintiffs rely on a point made in this court's previous opinion, specifically, that nowhere in the May 5, 2001 contract does it indicate that any entity other than O'Connor is the creditor for purposes of the transaction. *See Nevarez,* 303 F.Supp.2d at 939.

Accordingly, Defendants have not demonstrated that there is no genuine issue of fact as to whether O'Connor was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

functioning as a "participating creditor" subject to the requirements of § 202.4(d) in connection with the May 5, 2001 contract. Thus, summary judgment cannot be granted on that basis.

B. Whether Plaintiffs' acceptance and use of credit from Evergreen eliminated any requirement that O'Connor send an adverse action notice.

A creditor is required to notify an applicant in writing of an adverse action on an application or existing account. 12 C.F.R. § § 202.9(a)(1)(i), (iii); (a)(2). However, "[w]hen an application is made on behalf of an applicant to more than one creditor and the applicant expressly accepts or uses credit offered by one of the creditors, notification of action taken by any of the other creditors is not required." 12 C.F.R. § 202.9(g). Defendants argue that, even if O'Connor is deemed a "participating creditor" subject to the notification obligation, it was not required to send an adverse action notice to Jesus Nevarez because Plaintiffs expressly used and accepted credit extended by Evergreen, one of the five creditors to whom O'Connor submitted the credit applications. (Defs.' Mem. at 3-4.)

**\*8** Plaintiffs acknowledge that they accepted credit offered by one of the creditors (Evergreen), but contend that their acceptance pertained to the *second* contract they signed, namely, the May 19, 2001 contract. *See* Pls.' Resp. at 10-11. Plaintiffs argue that there were two separate, binding transactions-- the May 5, 2001 contract and the May 19, 2001 contract--and that the May 5, 2001 contract was unilaterally terminated by O'Connor, which Plaintiffs claim was an adverse action requiring O'Connor to send a notice. *Id.* Plaintiffs argue that the exception set out in 12 C.F.R. 202(9)(g) contemplates only one binding contract being formed, not one contract being terminated and another new contract being created as a replacement. (Pls.' Resp. at 11.) However, Plaintiffs

acknowledge, in response to a direct question posed by the court, that "there is no specific law or commentary either supporting or rejecting" their argument. (Pls.' Submission Pts. at 4.) [Dkt 97.]

Defendants cannot be liable under the ECOA unless the Plaintiffs were subjected to an adverse action without notification. There are definitions of "adverse action" in Regulation B, but they include exceptions that create issues in this case. The regulations state that an adverse action includes "[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application *unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered.*" 12 C.F.R. § 202.2(c)(1)(i) (emphasis added). An adverse action also includes "[a] termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts." *Id.* § 202.2(c)(1)(ii). However, if the change in the terms of the account is "expressly agreed to by an applicant," there is no adverse action requiring notification. *Id.* § 202.2(c)(2)(i).

Applying the regulations in this case raises the questions of whether the statements made by Soto which ultimately led to the May 19, 2001 contract constituted a "counteroffer" that was accepted by Plaintiffs, or whether the execution of the May 19, 2001 contract constituted a "change in the terms of an account expressly agreed to by an applicant." *Id.* § § 202.2(c)(1)(i), (ii); (c)(2)(i). If there was a counteroffer that was accepted by Plaintiffs or a change in the terms of an account to which Plaintiffs expressly agreed, then there was no adverse action requiring notification. [FN16]

> FN16. Plaintiffs argue in two footnotes that O'Connor was also required to give Leticia Nevarez an

adverse action notice when it denied her credit on May 5, 2001. (Pls.' Resp. at 4 n. 11, 11 n. 37.) However, Plaintiffs' Second Amended Complaint does not allege that Defendants violated the ECOA by failing to provide an adverse action notice with respect to the denial of credit to Leticia Nevarez. *See* 2nd Am. Compl. ¶ ¶ 51-61. The court will not consider claims made only in footnotes.

1. Counteroffer

Defendants argue that there was no adverse action because Plaintiffs' "initial application for credit [wa]s declined but coupled with a counteroffer with different terms, which [Plaintiffs] accept[ed]." (Defs.' Resp. Questions at 3- 4.) [Dkt 96.] Defendants rely on 12 C.F.R. § 202.2(c)(1)(i), quoted above.

While at first glance it might seem that the statements made by Soto which ultimately led to the May 19, 2001 contract constituted a counteroffer, a closer look reveals that that is not necessarily the case. If a contract was formed by the parties on May 5, 2001, then Jesus Nevarez's "application" for credit would no longer be pending, and O'Connor would not be in a position to make a "counteroffer." Thus, whether O'Connor made a counteroffer depends on whether O'Connor accepted Jesus Nevarez's May 5, 2001 application for credit and the parties entered into a binding contract. Plaintiffs argue that by allowing Mr. Nevarez to leave with the Mountaineer after he signed the contract, O'Connor provided a " 'notice' of acceptance." (Pls.' Submission Pts. at 3.) As discussed in the previous opinion, the record presented by the parties does not eliminate questions of fact as to whether the May 5, 2001 contract was a binding contract or merely an application. [FN17] On the present motion there is also the disputed evidence of the alleged Household Finance conditional approval. If

Household Finance approved the loan and accepted Mr. Nevarez's application, O'Connor could not have made a counteroffer, because the deal would have been complete. In short, Defendants have not demonstrated that there is no question of fact as to whether Plaintiffs accepted a counteroffer to grant credit on different terms. [FN18]

FN17. That opinion observed:
The terms of the May 5, 2001 contract are not set out as an "application" for credit; those terms appear to be a credit contract that O'Connor could have enforced against Plaintiffs.... [T]he terms of the May 5, 2001 contract set out an agreement under which O'Connor was extending credit to Plaintiffs pursuant to the financing terms set forth in the contract. Thus, when O'Connor could not find another lender to whom it could assign the contract, presumably O'Connor could have financed the transaction itself. O'Connor, however, declined to finance the transaction and voided the contract on May 19, 2001. *Nevarez*, 303 F.Supp.2d at 940. On the other hand, although the May 5, 2001 contract was signed by Jesus Nevarez, it was never signed by anyone at O'Connor. Additionally, the Affidavit of Spot Delivery (which was also signed by Jesus Nevarez) stated that if O'Connor was unable to obtain credit approval on the loan within three business days and Jesus Nevarez was unable to obtain financing on his own, he would be required to return the vehicle, which is at odds with viewing the May 5, 2001 contract as a binding contract to extend credit. *Id.* at 940-41.

FN18. Defendants cite *Davis v. U.S. Bancorp*, 383 F.3d 761, 767 (8th Cir.2004) and *Diaz v. Virginia*

2005 WL 678503
--- F.Supp.2d ---
**(Cite as: 2005 WL 678503 (N.D.Ill.))**

*Housing Dev. Auth.*, 117 F.Supp.2d 500, 505 (E.D.Va.2000) in support of their argument that a counteroffer was made. (Defs.' Resp. Questions at 3-4.) However, in both of those cases, the creditor made a counteroffer on an *application* that was pending. Here, in contrast, the court has not found that the May 5, 2001 contract was only an application.

**2. Change in the terms of an account**

**\*9** Finally, Defendants argue that there was no adverse action for a second reason, relying on 12 C.F.R. § 202.2(c)(2)(i), mentioned above, which states that the term "adverse action" does not include "[a] change in the terms of an account expressly agreed to by an applicant." Defendants point to regulations defining an "account" as "an extension of credit," and an "extension of credit" as "the granting of credit in any form...." 12 C.F.R. § 202.2(q). Defendants then argue that by retaining the Mountaineer without tendering full payment for it, Plaintiffs maintained a credit "account" with O'Connor, and that because Plaintiffs ultimately accepted credit extended to them by Evergreen, there was never any "termination of an account" pursuant to 12 C.F.R. § 202.2(c)(1)(ii). (Defs.' Reply at 3-5.) [FN19] According to Defendants, the changes between the May 5, 2001 contract and May 19, 2001 contract did not require an adverse action notification based on an unfavorable "change in the terms of an account," because those changes were "expressly and knowingly agreed to by the plaintiffs." (Defs.' Reply at 4-5.)

FN19. For this argument, Defendants assume, *arguendo,* that O'Connor is a "particiating creditor." (Defs.' Reply at 3.)

The parties essentially agree (at least *arguendo* ) that an "account" was created

on May 5, 2001 when Jesus Nevarez signed the May 5, 2001 contract and Plaintiffs left with the car. *See id.* at 3; Pls.' Submission Pts. at 3. In addition, there is no question that Plaintiffs expressly agreed to different terms in the May 19, 2001 contract. [FN20] However, Plaintiffs argue that the May 5, 2001 account was terminated before the May 19, 2001 contract was ever formed and, thus, they could not have agreed to any changes in that account. (Pls.' Submission Pts. at 3.) If the May 5, 2001 account was terminated, the new terms of the May 19, 2001 contract would not be "changes" to the account, but, instead, would be terms of a completely new account.

FN20. Plaintiffs argue that they were "deceived" into signing the May 19, 2001 contract, based on their contention that they were conditionally approved for financing from Household Finance and thus should not have had to sign a new contract. (Pls.' Resp. at 3, 9-10, 12-13; Pls.' Submission Pts. at 6.) In addition to the factual dispute about whether Household Finance actually approved Plaintiffs, Plaintiffs have not demonstrated that their argument (effectively a suggestion of fraud) is relevant to the present issue.

Defendants respond that even if the May 5, 2001 contract was terminated or voided, that termination did not result in the termination of the *account* or extension of credit to Plaintiffs because Plaintiffs continually had possession of the Mercury Mountaineer without tendering full payment for it. (Defs.' Reply at 3-4.) Thus, Defendants argue, Plaintiffs maintained a credit *account* under the ECOA, whether or not the May 5, 2001 *contract* was ever terminated or voided. (*Id.*) [FN21]

FN21. In response, Plaintiffs' counsel stated at oral argument that Plaintiffs only kept the car

2005 WL 678503
--- F.Supp.2d ---
(Cite as: 2005 WL 678503 (N.D.Ill.))

after the May 5, 2001 contract was voided because O'Connor did not return their down payment to them. However, the situation is not so simple. The original check that Plaintiffs had given O'Connor on May 5 was returned "NSF," and Leticia Nevarez returned to O'Connor on May 17, 2001 with a second down payment check. *See Nevarez,* 303 F.Supp.2d at 931. According to Plaintiffs, O'Connor deposited that check on May 18, and either that day or the following day were advised that Mr. Nevarez's financing had been rejected. (2nd Am.Compl.¶ ¶ 56-57.)

Although Defendants argue that there is a "distinction between a contract and an 'account' " under the ECOA (*id.* at 3), they have not provided authority (except for their own Interpretation of the regulations) to support that argument. Defendants do not explain how a credit account can exist in the absence of a contract between the parties pursuant to which the credit is extended. In addition, the contract that Plaintiffs signed on May 19, 2001 contained not only new terms, such as a higher down payment and an additional co-signer (Leticia Nevarez), but also a different creditor (Evergreen). Thus, the parties on both sides of the contract changed. Furthermore, Defendants make no effort to reconcile their current position with the Affidavit of Spot Delivery, the document that authorized Jesus Nevarez to take the vehicle. That Affidavit provided that Plaintiffs must return the vehicle if O'Connor was unable to obtain credit approval for Mr. Nevarez's loan or he was unable to get financing on his own. *See Nevarez* 303 F.Supp.2d at 940-41.

**\*10** In short, Defendants have not demonstrated that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law under their theory that no notification was required because there was an existing account that never terminated. Thus, summary judgment cannot be granted on that basis, either.

II. Defendants' request to dismiss Counts III though VII is moot.

Defendants argue that, if Count II is dismissed, the remaining state law claims should be dismissed for lack of jurisdiction. (Defs.' Mem. at 7-8.) Because Defendants are not entitled to summary judgement on Count II, Defendants' request to dismiss the state law claims is moot.

CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment on Count II is denied, and Defendants' request to dismiss Counts III through VII for lack of subject matter jurisdiction is moot.

IT IS SO ORDERED.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.